IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NORTH AMERICAN COMMUNICATIONS, INC.; NAC LOGISTICS, LLC; HMS GLOBAL DIRECT, LLC; HMS GLOBAL DIRECT 2, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ECLIPSE ACQUI INC.,<br><br>Defendant. | CIVIL ACTION - LAW<br><br>NO.  3:17-cv-167<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs, North American Communications, Inc., NAC Logistics, LLC, HMS Global Direct, LLC, and HMS Global Direct 2, LLC, by and through their attorneys, Rhoads & Sinon LLP, file the within Complaint, and in support thereof, aver the following:

### Parties

1. Plaintiff North American Communications, Inc. ("North American"), is a Pennsylvania corporation with a principal place of business of 141 NAC Drive, Duncansville, Pennsylvania 16635.

2. Plaintiff NAC Logistics, LLC ("Logistics"), is a Texas limited liability company with a principal place of business of 141 NAC Drive, Duncansville, Pennsylvania 16635. Logistics's sole member is North American.

1057002.1

3.     Plaintiff HMS Global Direct LLC ("Global Direct"), is a Texas limited liability company with a principal place of business of 141 NAC Drive, Duncansville, Pennsylvania 16635. Global Direct's sole member is North American.

4.     Plaintiff HMS Global Direct 2, LLC ("Global Direct 2" and, with North American, Logistics, and Global Direct, hereinafter referred to collectively as "NAC") is a Texas limited liability company with a principal place of business of 141 NAC Drive, Duncansville, Pennsylvania 16635. Global Direct 2's sole member is Global Direct.

5.     Upon information and belief, Defendant Eclipse Acqui Inc. ("Eclipse") is a Nevada corporation whose registered agent is William Leonard, 2777 Paradise Road, Unit 205, Las Vegas, Nevada 89109. Upon information and belief, Eclipse has its principal place of business in California.

**Jurisdiction and Venue**

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because diversity of citizenship exists between all Plaintiffs and Defendant, and the amount in controversy is in excess of $75,000.00, exclusive of interest and costs.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims stated in this Complaint occurred in this district. The principal office of NAC is located in this district, and all Plaintiffs regularly conduct their business in this district. Acts of Defendant have occurred in this district. The injury complained of is being inflicted in this district.

**Factual Background**

8.     NAC and AloStar Bank of Commerce ("AloStar") entered into a certain Loan and Security Agreement dated May 29, 2015 (as amended, restated, modified and/or supplemented

from time to time and in effect (and including, without limitation, all riders and terms schedules related thereto) collectively, the "Loan Agreement"). A copy of the Loan Agreement is attached hereto as Exhibit "A".

9. The Loan Agreement covered certain term debt due AloStar in the original principal amount of $2,039,000.00 (the "Term Loan") and a revolving line of credit in favor of NAC in the amount of $6,000,000.00 (the "Revolver Loan").

10. The purpose of the Revolver Loan was to permit NAC to utilize a line of credit to satisfy certain trade payables and other current debt in conjunction with the operation of its business.

11. As of August 15, 2017, the amount due under the Term Loan was approximately $1,155,000.00 and no amount was outstanding under the Revolver Loan.

12. The Loan Agreement also provided that AloStar could exercise certain rights and remedies, but only upon the occurrence of a specifically defined "Event of Default". [<u>See</u> Loan Agreement §§ 10.1, 10.2.]

13. In connection with the Loan Agreement, NAC executed and delivered, or caused to be executed and delivered, to or for the benefit of AloStar certain other loan documents, including but not limited to, deposit account control agreements, consents, assignments, security agreements, pledge agreements, agreements, instruments, guarantees and financing statements in connection with the indebtedness referred to in the Loan Agreement (all of the foregoing, together with the Loan Agreement, are hereinafter collectively referred to as the "Loan Documents").

14. Among the Loan Documents was a Pledge Agreement (hereinafter referred to as the "Pledge Agreement – Capital Stock") between the shareholders of North American, and

3

AloStar, pursuant to which the shareholders pledged their respective shares of the capital stock of North American (hereinafter referred to as the "Pledged Stock") to AloStar as security for the obligations of NAC under the Loan Documents.

15. Also among the Loan Documents was a second Pledge Agreement (hereinafter referred to as the "Pledge Agreement – Membership Interests") between North American and Global Direct, and AloStar, pursuant to which North American pledged its membership interests in Logistics and Global Direct, and Global Direct pledged its membership interest in Global Direct 2 (hereinafter referred to collectively as the "Pledged Membership Interests"), to AloStar as security for the obligations of NAC under the Loan Documents.

16. On July 31, 2017, NAC and AloStar agreed to the terms of a forbearance agreement in conjunction with the Loan Documents (the "Forbearance Agreement"). A copy of the Forbearance Agreement is attached hereto as Exhibit "B".

17. Under the terms of the Forbearance Agreement, AloStar could terminate its agreement to forbear only upon the occurrence of a specifically defined "Termination Event". [See Forbearance Agreement § 4(a)-(f).]

18. Further, under the terms of the Forbearance Agreement, NAC was required to perform certain tasks by certain dates. [See id. § 5.]

19. One of the requirements was the execution of a letter of intent with a third party that resulted in payments of all amounts due AloStar under the Loan Documents. [Id. § 5(e).]

20. The Forbearance Agreement also provided that if payment in full of the amount due under the Loan Documents was not made by close of business on August 18, 2017, then NAC was required to retain and employ a financial and management consultant by close of business on August 23, 2017. [Id. § 5(f).]

4

21. In accordance therewith, NAC executed a letter of intent with a third party on August 2, 2017, which contained an agreement whereby all amounts due under the Loan Documents would be repaid in accordance with the timeframes set forth in the Forbearance Agreement.

22. One of the requirements of the letter of intent was that NAC secure the agreement of two former owners of NAC under the terms of certain retirement agreements with such individuals, to release liability thereunder.

23. Although the express terms of each retirement agreement provide that payments due thereunder are subordinate to any bank debt and trade payables, one of the parties to one of the retirement agreements, Michael Herman, refused.

24. As a result of Michael Herman's refusal, NAC would not be able to close under the terms of the letter of intent.

25. As a result, Robert Herman, NAC's president, approached a former colleague and business partner, Manny Ortiz, about the possibility of structuring a transaction similar to that which was set forth in the letter of intent referenced herein.

26. Thereafter, on or about August 10, 2017, Eclipse, acting through its authorized representative Mr. Ortiz, made a proposal to acquire the stock of NAC and pay off the debt due AloStar under the Loan Documents.

27. Representatives of NAC at all times believed that Eclipse and Mr. Ortiz were acting in good faith.

28. Upon information and belief, Eclipse and Mr. Ortiz were working with or for the benefit of Michael Herman.

29. Subsequently, NAC and its shareholders rejected Eclipse's proposal.

1057002.1

30. Thereafter, in furtherance of its scheme, and without the approval or consent of NAC, on or about August 15, 2017, Eclipse entered into an Assignment and Assumption Agreement with AloStar in which AloStar purportedly assigned all of its interests in the Loan Documents to Eclipse.

31. Pursuant to the Assignment and Assumption Agreement, Eclipse claimed it became a successor in interest to AloStar with regard to certain portions of the Loan Documents.

32. This fact was confirmed by AloStar via an email communication to NAC, though at the time neither Eclipse nor AloStar provided NAC with a copy of the Assignment and Assumption Agreement. [AloStar Email, attached hereto as Exhibit "C"].

33. AloStar maintained that Eclipse had been assigned all rights and obligations arising under the terms of the Loan Documents, including the rights and obligations associated with the Revolver Loan.

34. As a result, AloStar advised that the Revolver Loan was not available to NAC through AloStar.

35. Eclipse denied that it had acquired any of the rights and obligations under the Revolver Loan and failed and refused to provide a line of credit to NAC under the express terms of the Loan Documents and the Revolver Loan.

36. As a result, NAC was faced with no ability to borrow under the Revolver Loan despite having a legal right to do so under the Loan Documents and Forbearance Agreement.

37. The unavailability of the Revolver Loan created substantial risk on the operations of NAC and placed it in serious jeopardy of being unable to fulfill its contractual obligations to its clients and employees.

1057002.1

38. On August 18, 2017, representatives of Eclipse were advised by representatives of NAC that it (NAC) intended to pay off all amounts due under the Loan Documents on or before the close of business on Wednesday, August 23, 2017, thereby avoiding the costs and expenses of securing a financial consultant under the Forbearance Agreement.

39. According to AloStar, the total amount transferred by Eclipse in connection with the Assignment and Assumption Agreement was $1,209,877.27, which consisted of the following:

      a. Term Note: $1,155,433.42

      b. Early Termination Fee: $35,777.17

      c. Interest: $8,666.68

      d. Legal Fees: $10,000.00

40. On August 18, 2017, Eclipse advised that information regarding the payoff amounts and wire instructions would be available from Eclipse's counsel, Douglas Holthaus. [August 18, 2017 Email, attached hereto as Exhibit "D"].

41. On Tuesday, August 22, 2017 and throughout the day on Wednesday, August 23, 2017, NAC attempted to obtain payoff information and wire instructions from Eclipse.

42. Eclipse failed and refused to provide either payoff information or wire instructions to NAC that would have enabled NAC to pay off the full amount due under the Loan Documents on or before the close of business on August 23, 2017.

43. Despite NAC's willingness to pay in full all amounts and obligations due and owing under the Loan Documents, on August 23, 2017, Eclipse sent a Default Notice to NAC in which Eclipse purported to exercise its rights under the Loan Agreement based on certain alleged "defaults", including NAC's alleged failure to secure and retain the financial consultant and to

pay NAC's obligations under the Loan Documents. [See Notice of Acceleration and Exercise of Default Rights ("Default Notice") at 1-2, attached hereto as Exhibit "E"].

44. In the Default Notice, Eclipse also threatened to, among other things, sell the Pledged Stock and Pledged Membership Interests, which it alleged it had in its possession from AloStar.

45. Specifically, Eclipse advised of its

> intent to exercise . . . all of its rights and remedies as authorized by the Loan Agreement including, without limitation, foreclosure upon the securities and equities conveyed by Borrowers and each of you, and including those certain equities and securities pledged as security for such Loan Agreements [sic].
>
> . . . .
>
> The Undersigned intends to and shall exercise those several powers of attorney granted [AloStar] to transfer and convey by private sale and without further notice, of one hundred percent (100%) of the [Pledged Stock], and one hundred percent (100%) of the [Pledged Membership Interests].

[Id. at 1-2.]

46. Despite there being no Event of Default under the Loan Agreement, despite there being no Termination Event under the Forbearance Agreement, and despite there being no basis under law, had Eclipse converted or attempted to convert Plaintiffs' Pledged Stock and Pledged Membership Interests, such action would have resulted in immediate and irreparable harm that could have resulted in the failure of Plaintiffs' business and created defaults under Plaintiffs' other contractual obligations.

47. Eclipse knew these facts and fabricated and induced the claimed default in order to extract financial payments from Plaintiffs to which it was not entitled and/or to force the sale of NAC's stock to Eclipse or its representatives, as it had previously attempted to do.

8

48. On August 25, 2017, after declaring the above default and advising of the intent to sell the Pledged Stock and Pledged Membership Interests, Eclipse provided NAC with another payoff amount of $1,376,210.94 (the "Payoff Amount") as the claimed amount due under the Loan Documents. [August 25, 2017 Correspondence from D. Holthaus, attached hereto as Exhibit "F"].

49. Eclipse claimed the amount consisted of "legal, accounting, and associated due diligence expenses, early termination fees, daily interest accruals and monthly maintenance fees in additional to other authorized charges set forth in the Loan Documents."

50. Eclipse failed to provide any documentation for the amount, or any explanation as to why NAC was required to pay over $200,000.00 more than the amount actually owed under the Loan Documents, and over $165,000.00 more than what Eclipse had paid AloStar just one week earlier.

51. To date, Eclipse has wholly failed to establish any basis for the fraudulently inflated Payoff Amount.

52. During an August 25, 2017 telephone call with counsel for NAC, counsel for Eclipse indicated that in exchange for the Payoff Amount, Eclipse would terminate all obligations under the Loan Documents, return all collateral to NAC, and satisfy all obligations under the Loan Documents.

53. Upon receipt of the Payoff Amount, Eclipse promised that it would release all possessory collateral (the "Possessory Collateral") in its possession and satisfy/release all filings, pledges, and guarantees under the Loan Documents, including, but not limited to, the following items:  1) original stock certificates and membership interests of the Borrower or Guarantors under the Loan Documents, including the Pledged Stock and Pledged Membership Interests; 2) a

satisfaction of the mortgage on the real property of North American located at 141 NAC Drive, Duncansville, Pennsylvania; 3) release all interests deposit control agreements and lock box agreements; and 4) terminate all financing statements of record against the Borrowers and/or Guarantor under the Loan Documents.

54. The terms outlined in Paragraphs 52 through 53 above, were reduced to a written agreement (the "Agreement"), a true and correct copy of which is attached hereto as Exhibit "G".

55. Plaintiffs signed the Agreement under duress and only because there was an actual and imminent threat that Eclipse would either sell the Pledged Stock and the Pledged Membership Interests, as it threatened to do in the Default Notice, or, more sinisterly, attempt to acquire and assert ownership and control of NAC

56. On August 28, 2017, counsel for Eclipse represented to counsel for NAC that his client would be signing the Agreement and that his client was prepared to release the Possessory Collateral outlined above.

57. Counsel for Eclipse is, in addition, an authorized signer and an officer of Eclipse.

58. On August 29, 2017, NAC transferred the Payoff Amount to Eclipse.

59. The transfer of the Payoff Amount was done under an urgent and immediate necessity, in the face of irreparable damage to NAC's business, and solely to avoid Eclipse selling or attempting to sell the Pledged Stock and Pledged Membership Interests, despite having no legal basis to do so, in furtherance of its fraudulent scheme.

60. But for Eclipse's predatory, extortionist, and fraudulent acts set forth above, NAC would not have paid the fraudulently inflated Payoff Amount to Eclipse and, in fact, there was no basis under the Loan Documents for such amount to be due Eclipse.

10

## Count I

### Breach of Contract

61. All preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

62. NAC and AloStar entered into and were parties to the Loan Agreement and the Forbearance Agreement.

63. As the purported assignee of and successor in interest to AloStar under the Loan Documents, including the Loan Agreement and the Forbearance Agreement, Eclipse assumed AloStar's obligations under the Loan Agreement and the Forbearance Agreement.

64. Eclipse was advised by NAC that it (NAC) intended to pay off all amounts due under the Loan Documents on or before the close of business on August 23, 2017.

65. Eclipse knew that NAC intended to pay off all amounts due under the Loan Documents and, therefore, would not be employing a financial consultant by August 23, 2017, as required by the Forbearance Agreement.

66. Eclipse advised that information regarding the payoff amounts and wire instructions would be available from Eclipse's counsel.

67. Despite having advised NAC that payoff information and wire instructions would be made available to NAC, and despite NAC having made repeated attempts to obtain payoff information and wire instructions from Eclipse, Eclipse failed and refused to provide either payoff information or wire instructions to NAC that would have enabled NAC to pay off the full amount due under the Loan Documents on or before the close of business on August 23, 2017.

68. By failing and refusing to provide either payoff information or wire instructions to NAC, Eclipse knowingly prevented and hindered NAC's ability to perform its obligations under the Loan Agreement and the Forbearance Agreement.

69. Thereafter, Eclipse sent the Default Notice to NAC in which Eclipse threatened to sell the Pledged Stock and Pledged Membership Interests.

70. However, no Event of Default had occurred under the Loan Agreement, and no Termination Event had occurred under the Forbearance Agreement.

71. On the contrary, Eclipse fabricated and induced the claimed default in order to extract financial payments from NAC to which it was not entitled and/or to force the sale of NAC's stock to Eclipse or its representatives.

72. Indeed, Eclipse provided NAC with the Payoff Amount of $1,376,210.94, which far exceeded any amount to which Eclipse was entitled under the Loan Documents.

73. Under duress, NAC agreed to transfer and did transfer the Payoff Amount to Eclipse solely to avoid Eclipse selling or attempting to sell the Pledged Stock and the Pledged Membership Interests and commensurate irreparable harm to NAC's business.

74. Eclipse had no right under the Loan Agreement, Forbearance Agreement, or any other Loan Document to prevent NAC's performance of its contractual obligations, to send the Default Notice, to threaten to sell the Pledged Stock or Pledged Membership Interests, to demand the Payoff Amount, or take any other action Eclipse purported to take.

75. Accordingly, Eclipse has breached the Loan Agreement and the Forbearance Agreement.

1057002.1

76. As a direct and proximate result of Eclipse's breach of the Loan Agreement and the Forbearance Agreement, NAC has sustained damages in an amount not less than $166,333.67.

## Count II

### Breach of the Implied Covenant of Good Faith and Fair Dealing

77. All preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

78. Every contract, including the Loan Agreement and the Forbearance Agreement, implies a covenant of good faith and fair dealing in the contract's performance and enforcement.

79. As such, in performing its contractual obligations under the Loan Agreement and the Forbearance Agreement, Eclipse had a duty to act in good faith and deal fairly with NAC and not to act arbitrarily or capriciously or to secure an economic or pecuniary advantage to the detriment of NAC.

80. The implied duty also required Eclipse to perform its promises and to provide such cooperation as was required for NAC's performance.

81. Furthermore, the Loan Agreement also imposed an obligation of good faith in its performance and enforcement, and thus required Eclipse to act honestly and observe reasonable commercial standards of fair dealing in the performance of its obligations under the Loan Agreement.  [See Ga. Code Ann. §§ 11-1-201(b)(20), 11-1-304.]

82. As averred above in Paragraphs 62 through 76, Eclipse breached the Loan Agreement and the Forbearance Agreement.

13

83. Further, in breaching its contractual obligations under the Loan Agreement and the Forbearance Agreement, Eclipse acted in bad faith and, therefore, breached the covenant of good faith and fair dealing.

84. Specifically, by deliberately failing to provide NAC with payoff information or wire instructions – which prevented NAC from paying off the full amount due under the Loan Documents – Eclipse caused and induced the purported default on which it relied in sending the Default Notice and threatening to sell the Pledged Stock and the Pledged Membership Interests.

85. Eclipse deliberately failed to provide NAC with payoff information or wire instructions in order to extract financial payments from NAC to which it was not entitled under and/or to force the sale of NAC's stock to Eclipse or its representatives – which had previously attempted to purchase such stock and whose proposal to acquire such stock was rejected by NAC and its shareholders.

86. And by threatening to sell the Pledged Stock and the Pledged Membership Interests – the sale of which Eclipse knew would cause immediate and irreparable harm to NAC's business and its contractual relationships with third parties – Eclipse sought to secure an economic advantage to the detriment of NAC to which it was not entitled.

87. Further evidence of Eclipse's bad faith was its failure and refusal to provide a line of credit to NAC under the Revolver Loan, despite NAC having a legal right to do so under the Loan Agreement and Forbearance Agreement.

88. The unavailability of the Revolver Loan created substantial risk on the operations of NAC and placed it in serious jeopardy of being unable to fulfill its contractual obligations to its clients and employees.

1057002.1

89. Accordingly, Eclipse acted in bad faith and breached the implied covenant of good faith and fair dealing.

90. Eclipse also acted dishonestly and failed to observe reasonable commercial standards of fair dealing in the performance of its obligations under the Loan Agreement.

91. As a direct and proximate result of Eclipse's breach of the implied covenant of good faith and fair dealing and its dishonest and commercially unreasonable actions, NAC has sustained damages in an amount not less than $166,333.67.

92. Because Eclipse acted in bad faith in its performance under the Loan Agreement and the Forbearance Agreement, NAC is entitled to its expenses of litigation, including attorney's fees, as part of its damages, pursuant to Ga. Code Ann. § 13-6-11.

## Count III

## Unjust Enrichment (in the alternative)

93. All preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

94. NAC conferred a benefit on Eclipse when NAC transferred the Payoff Amount to Eclipse.

95. The Payoff Amount of $1,376,210.94 far exceeded the amount to which Eclipse was entitled under the Loan Documents.

96. Eclipse knowingly accepted and appreciated the benefit conferred by NAC.

97. Eclipse has accepted and retained such benefit under such circumstances, as described in this Complaint, that it would be inequitable and unjust for Eclipse to retain the benefit conferred by NAC.

98. Eclipse has been unjustly enriched in an amount not less than $166,333.67.

1057002.1

99. NAC is entitled to restitution of such amount.

## Count IV

## Fraud

100. All preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

101. Eclipse falsely represented that the Payoff Amount to fully satisfy all amounts and obligations due under the Loan Documents was $1,376,210.94.

102. Eclipse made this false representation with knowledge of its falsity or recklessness as to whether it was true or false, and in furtherance of its scheme to force the sale of NAC's to Eclipse.

103. Eclipse made this false representation with the intent of inducing NAC to rely on such false representation in furtherance of its illicit scheme.

104. NAC justifiably and detrimentally relied on Eclipse's false representation and transferred the fraudulently inflated Payoff Amount to Eclipse in order to obtain the release of the Possessory Collateral and to avoid Eclipse selling or attempting to sell the Pledged Stock and Pledged Membership Interests.

105. As a direct and proximate result of Eclipse's false representation, NAC has sustained damages in an amount not less than $166,333.67.

106. Further, Eclipse's actions, as described in this Complaint, were outrageous, malicious, and vindictive, and displayed a wholly wanton disregard for the rights of NAC.

107. Accordingly, NAC is entitled to punitive damages.

**Prayer for Relief**

**WHEREFORE**, Plaintiffs North American Communications, Inc., NAC Logistics, LLC, HMS Global Direct, LLC, and HMS Global Direct 2, LLC, respectfully request:

(1) Judgment in favor of Plaintiffs and against Eclipse for all direct, consequential, compensatory, incidental, special, and punitive damages arising out of Eclipse's aforesaid wrongful conduct, together with interest and costs;

(2) Expenses of litigation, including attorneys' fees, pursuant to Ga. Code Ann. § 13-6-11;

(3) A trial by jury on all issues so triable; and

(4) Such other legal or equitable relief as the Court deems proper and just.

**Jury Trial Demand**

Plaintiffs North American Communications, Inc., NAC Logistics, LLC, HMS Global Direct, LLC, and HMS Global Direct 2, LLC, respectfully demand a trial by jury on all issues so triable.

RHOADS & SINON LLP


By: /s/Timothy J. Nieman
   Timothy J. Nieman, Esq.
   William C. Boak, Esq. (pro hac vice pending)
   One South Market Square
   PO Box 1146
   Harrisburg, PA 17108-1146
   Telephone: (717) 233-5731

*Attorneys for Plaintiffs*